# CENTRAL OF GEORGIA RAILWAY CO. *v.* FELTON.

1. One may at pleasure repudiate a contract which his agent, in direct violation of positive instructions previously given him, undertakes in his representative capacity to make with a third person who is fully cognizant that such agent is transcending his authority in the premises. This familiar rule of law is peculiarly applicable to a case where it appears that the agent of a railway company attempted to make with himself, as consignor, a totally unauthorized contract of affreightment.
2. There was, in the present case, no evidence authorizing a charge to the effect that, notwithstanding the agent may have violated his instructions, yet if the railway company "had knowledge of such contract and acquiesced in it, then it would be liable to the plaintiff under that contract."
3. For no reason assigned were other portions of the charge excepted to erroneous; and, save as to the matter referred to in the preceding note, no material error appears to have been committed at the trial.

Argued November 8, 1899. — Decided April 11, 1900.

Action for damages. Before Judge Littlejohn. Macon superior court. November term, 1898.

*William D. Kiddoo,* for plaintiff in error.
*M. Felton Hatcher* and *Guerry & Hall,* contra.

Fish, J. The plaintiff below, W. H. Felton, brought suit against the Central of Georgia Railway Company for damages alleged to have been sustained by reason of unreasonable delay in the transportation of four car-loads of peaches shipped by him during the month of July, 1896, from Winchester, Ga., to Baltimore, Md., under through contracts of affreightment, by the terms of which he reserved the right to divert the shipments from the destination specified to such other point as he might designate before carriage was completed by delivery at Baltimore. In its answer the defendant company denied that any through contract was made as alleged. It set up the defense that, on the contrary, it accepted the shipments for carriage to the end of its line only, with the express understanding that its liability should cease upon delivery of the peaches in good order to the next connecting carrier; and, having fully performed its undertakings in this regard, it was not answerable in damages for any delay which might have occurred on any of its connect-

ing lines.   On the trial of the issue thus formed, a verdict was returned in favor of the plaintiff.   The case comes to this court upon a bill of exceptions assigning error upon the refusal of the judge to sustain a motion for a new trial, duly filed by the losing party.   Such other facts as are essential to an understanding of the rulings herein made will be developed as the discussion which follows progresses.

1. Having alleged the making of special contracts by the terms of which the company obligated itself to transport the peaches within a reasonable time to their ultimate destination, it was, of course, incumbent on the plaintiff to prove his case as laid, especially in view of the fact that the undisputed evidence showed that the delay complained of occurred on a line other than that operated by the Central Railway Company.   On the trial, it appeared that the plaintiff was the company's agent at Winchester, the station from which the shipments of peaches were made, and, as such agent, undertook to bind the company by contracts of affreightment, made in behalf of himself in his capacity of shipper, which, the company contended, were on terms more favorable than it had authorized him, as its agent, to offer to its patrons.   The issue was thus squarely presented whether or not Felton, acting as agent for the company, really exceeded his authority in the premises, and, in this connection, the defendant showed by uncontroverted evidence the following facts:   In June, 1895, the company fixed the rates to be charged by its local station agents on "green fruit," and issued to each of them printed instructions in regard thereto.   The copy of these instructions which was sent to Felton, its agent at Winchester, was introduced in evidence, the same having come from his custody under a notice to produce it at the trial.   Direction was thereby given him that certain reduced rates named therein applied "only on shipments when the carrier is released from liability, except for its own negligence, and when the valuation is limited to $500 per car in accordance with the contract of bill of lading prepared for such shipments, which must be signed by the shipper before these rates can be taken advantage of"; and that "on all shipments for which released bills of lading are not signed by the shipper, the rates [were] 50 per cent. higher than

those shown." Felton was furnished with a suitable quantity of blank bills of lading of the form just referred to, with instructions that the same were to be used in the shipment of fruit, and he was also directed to "make a request on the purchasing agent" if more were needed. The contract therein embraced contained various stipulations as to the obligations assumed by the company and as to its liability in the event of loss or delay. Among others was the following: "The responsibility, either as common carrier or warehouseman, of each carrier over whose line the property shipped hereunder shall be transported, shall cease as soon as delivery is made to the next carrier or to the consignee; and the liability of the said lines contracted with is several and not joint; neither of the said carriers shall be responsible or liable for any acts, omissions, or negligence of the other carriers over whose lines said property is, or is to be, transported." Another stipulation was, that unless the destination of any given shipment should be "on its own road," the initial carrier obligated itself merely "to deliver to another carrier on the route to destination." The same rates prevailed during 1896, and in June of that year the company redistributed to all of its freight agents the printed instructions issued to them in 1895. Notwithstanding his positive instructions not to give shippers the benefit of the reduced rate unless they signed bills of lading setting forth the contract of limited liability above referred to, Felton, when he shipped the peaches which are the subject-matter of this litigation, took advantage of this reduced rate without signing such bills of lading; and long subsequently, when this fact came to the knowledge of the officials of the railway company, he positively declined to furnish them with bills of lading of this kind signed by himself as the shipper of the four cars in question, though expressly requested to do so.

From the testimony introduced in behalf of the plaintiff it appears that while he was, indeed, the company's agent at Winchester, the routine work connected with the office at that point was really done by a clerk in his employ, he merely exercising a general supervision over the business; and accordingly, when he shipped the peaches in question at the reduced rate without signing bills of lading in the prescribed form, he acted in perfect

good faith and with no purpose of violating or disregarding the duty he owed the company as its agent. In this connection it was further shown that he had uniformly, as such agent, given the same rate to other shippers at Winchester without requiring them to sign any special contract, and had himself previously shipped from a near-by station peaches on his own account at the same rate, the agent at that station not requiring him or other shippers to sign any bill of lading at all. This explanation, though showing absolute good faith on the part of Felton, can not, in our opinion, overcome the positive and unequivocal evidence introduced by the company, showing that, as matter of fact, there was at least a technical violation on his part of the duty he owed it as its agent, the consequences of which he, rather than it, should suffer. Clearly, the fact that he had previously, in dealing with other shippers, disregarded his principal's orders, could not be invoked by him as an excuse for failing to observe such orders when undertaking to bind the company by a contract made with himself individually. Nor can it be said he was relieved of the duty he owed to his company merely because another agent, at a neighboring station, for any reason neglected to obey like instructions from the company which he had received. The law is well settled that: "When the directions to an agent are clear and well defined, it is his duty to follow them faithfully, provided this may be lawfully done. . . Although the agent is, in the absence of instructions, bound to follow the established usage or mode of dealing, yet no custom or usage will authorize a departure from positive instructions; the instructions of the principal make the law by which the agent is to be governed." 1 Am. & Eng. Enc. L. (2d ed.) 1062. And as a matter of course, when in dealing with third persons the agent transcends his authority or otherwise violates his duty, "if such persons are aware of the instructions, the principal is not bound." Ibid. 995. So, even if the plaintiff stands upon the same footing as would a third person who, knowing all he did, made a similar contract of affreightment with an agent of the company, the conclusion seems irresistible that the company can not, legally or equitably, be held liable to the plaintiff on the ground that it became bound by the acts of its agent, irrespective

of the question whether such agent did or did not act within the scope of his authority. The company had issued explicit printed instructions to all its agents, including Felton, concerning the rates to be charged on different classes of freight. Considered as an individual, he certainly knew that, as agent, he had no authority to himself fix any rate in disregard of express orders, and that the precise measure of his authority as to the shipment of fruit was readily ascertainable by reference to printed instructions on file in his office. · In other words, he was not a general agent, but one with restricted powers. Accordingly, one who knew not only this fact but also that his authority, as agent, was in writing and open to inspection at the particular time and place, could not be heard to say that he was acting within the apparent bounds of his authority. " Third parties dealing with an agent are put upon their guard by the very fact, and do so at their own risk. They can not rely upon the agent's assumption of authority, but are to be regarded as dealing with the power before them, and must, at their peril, observe that the act done by the agent is legally identical with the act authorized by the power." 1 Am. & Eng. Enc. L. (2d ed.) 986, 987, cited approvingly in *Camp* v. *Southern Banking Co., 97 Ga.* 586. In no view of the question, therefore, can it fairly be said that the defendant company was not at liberty to defend the plaintiff's action on the ground that it was not legally bound by the alleged contracts of affreightment upon which he bases his right to recover.

2. A witness introduced by the plaintiff testified that he lived " at Marshallville, about three miles from Winchester," and, though he had " been engaged in shipping peaches from Marshallville to the northern markets for twenty years or more, " he never saw a bill of lading until after 1896, and did not " think shippers took any bills of lading before " that year. On cross-examination, however, he further testified : " I never shipped peaches from Winchester. We were required this year, for the first time, to get bills of lading, and I trusted to the refrigerator company to get my bills of lading. It is a fact that I have seen bills of lading like the blank handed me by counsel, prior to that time, signed up for myself and others. I stated

before that we signed bills of lading years ago, but we have not done it recently. I do not recollect about 1896, but I do recollect that the roads were using the blank handed me for some of the bills of lading. I do not remember whether the parties, when they signed these, got a less rate of freight than if there had been a shipment without, or not." Several other witnesses testified on the same line, but none of them undertook to say that the reduced rate was allowed in any instance where a bill of lading was not required. Felton himself swore: "We shipped peaches for the very price other people were charged. There was no bill of lading issued to anybody. I shipped from Marshallville last year and never had a bill of lading from there nor anywhere else. I never had one until this year." He also testified: "We are compelled to issue them this year, we never did before, and turn them over to him [the shipper]; now we force him to take the bill of lading." The plaintiff's son-in-law, who acted as his agent in the northern markets in disposing of his fruit, testified: "Mr. Felton shipped peaches from Marshallville in 1895, 1896 and 1898, at the same rate as from Winchester, which rate has prevailed ever since we have been shipping peaches. I do not know about the special rate given without release at all. I know that is the rate we paid. I don't know whether it was a rate given released or not." In this connection, the trial judge, after charging the jury to the effect that the railway company would not be bound by any contract which Felton undertook to make with himself in violation of his positive instructions, added: "Yet, if you should believe from the testimony that such contract was made contrary to his instructions or authority from the railway company, and they had knowledge of such contract and acquiesced in it, then it would be liable to the plaintiff under that contract." This portion of the charge is excepted to, "because not good law under the facts of this case," and because "there was no evidence of any knowledge on the part of any officer or employee of the company [who] could acquiesce, or any acquiescence on the part of the railway company" itself. We think the point well taken. The mere fact that, during the season of 1896, one or more agents of the company departed from their orders in regard to shipping

fruit to points beyond its line, certainly would count for nothing, in the absence of any evidence tending to show that the company was aware that no bills of lading were issued, and tacitly assented to shipments being received at reduced rates without requiring shippers to sign the special contract hereinbefore mentioned. It does appear that the plaintiff or his agent was permitted to divert the shipments from their original destination to other northern markets, and that the peaches were delivered without the production of a bill of lading. But this circumstance was fully explained by the company's general agent, who was in "charge of the movement of the peach business" during the season of 1896, and who testified, in substance, as follows: As a favor to its patrons, the company tried to assist them to reach good markets. When it was ascertained their fruit was consigned to an "overstocked" market, they were permitted, upon giving the company prompt notice of this fact, to change the original destination and direct the shipments to be turned over to different consignees. As to two of the cars shipped by the plaintiff, when notice was received from his northern agent to divert the shipments to points designated, the company's general agent immediately complied with the request to give appropriate orders for such change, without requiring a surrender of bills of lading, as the shipments were composed of "perishable stuff," and the matter could not be delayed. He, however, at once telegraphed to the company's local agent at Marshallville to procure the bills of lading which he supposed had been issued to Felton, and in a day or two received two bills of lading, properly filled out, which purported to have been signed by Felton. As to the other shipments which were subsequently diverted in like manner, the necessary orders were at once issued without requiring the production of bills of lading, upon the assumption that the same were in Felton's possession and would be surrendered on demand. In other words, the company endeavored to accommodate the shipper by giving orders to divert the shipments and to turn the same over to such person at the ultimate destination as the shipper might direct; and although its general agent desired to protect his company by getting possession of the bills of lading, in order that they might not get into

the hands of innocent third persons, he relied upon the shipper to surrender such bills of lading as soon as practicable after the change requested by him was made.

The two bills of lading which the witness testified were received by him in response to his request upon the agent at Marshallville to secure the originals issued to the plaintiff were produced at the trial, although neither of the signatures to the same appears to have been made by the plaintiff or by any one authorized by him to sign his name thereto. On the contrary, both the plaintiff and his clerk testified that no bills of lading covering any of the shipments were ever issued, and those produced at the trial were not genuine. In several telegrams which passed between the railroad officials concerning the diversion of the four cars of peaches shipped by the plaintiff, reference is made to the matter of procuring the surrender of the bills of lading which they assumed had been issued; so, it would seem, no inference can fairly be drawn that, simply because the company allowed the shipments to be diverted and turned the same over to the plaintiff's agent in the north without requiring a surrender of a bill of lading, the company's officials must, of necessity, have known that no bills of lading were in fact issued. Nor was it shown that the company derived such knowledge from any other source. The record before us does disclose that the company had in its employ an auditor who, during the years 1895 and 1896, visited the company's office at Winchester from time to time, examined the agent's books and other papers, and reported that the affairs of the office were being properly conducted. However, it affirmatively appears that this auditor had no knowledge of the fact that Felton did not require shippers to sign bills of lading, and that it was not in the line of the auditor's duty to inquire whether the company's station agents followed the instructions issued to them as to giving reduced rates only in the event shippers signed the prescribed form of special contract in consideration of which such rates were offered. The plaintiff himself testified he never told the auditor about the practice in this regard which prevailed at that office, and further said on cross-examination: "We have now to keep a duplicate bill of lading. We give one

to the shipper and the other is kept.   We were never forced to do it, I will say, before this case was commenced."   So, it would seem, if during the years 1895 and 1896 agents were not required to keep on record in their offices duplicate bills of lading, the auditor, however diligently he may have performed his duties, could hardly have surmised, from the absence of such duplicates, that no original bills of lading were being issued in accordance with instructions.   Whether, had it been shown this officer did in fact know of a violation by agents of such instructions, his failure to make objection to the practice would amount to an implied ratification binding upon the company, we are not called upon to decide.   Suffice it now to say, that knowledge was not brought home to any official of the company who had power, in its behalf, to ratify the contracts of affreightment upon which the plaintiff relies, but which, as has been seen, can not be deemed binding upon the company in the absence of satisfactory evidence tending to show that it subsequently ratified the same.

3. Exception is also taken to other instructions given to the jury, though no attempt to assign error thereon is made otherwise than by characterizing such instructions as erroneous.   As was ruled in *Anderson* v. *Southern Ry. Co.,* 107 *Ga.* 500, a general assignment of error upon a designated portion of a charge is to be treated as raising the single question whether or not the instruction thus complained of " states a correct abstract principle of law."   The charges now under consideration are not open to the objection that the propositions therein announced are unsound.   Whether these instructions were precisely adjusted to the facts of this particular case is a question upon which we will not attempt to pass, as this is a matter which the loose and general assignment of error above referred to does not properly bring under review.   In the motion for a new trial complaint is made that the court erred in rejecting certain evidence offered in behalf of the defendant, and also in admitting other evidence introduced by the plaintiff over objection of counsel for the railway company.   In the view we take of the case, however, the points thus raised are of little importance, and need not be specifically dealt with; for they can not become material at the next

hearing, unless, as we think is hardly probable, the facts brought to light by the evidence are essentially different from those appearing in the record before us.    At any rate, if any substantial error was committed by the trial judge in the admission or rejection of evidence, we may safely trust him to correct the same upon the next hearing.

*Judgment reversed.    All the Justices concurring.*