### A00A1089. FAULKNER et al. v. HOOD et al.
(539 SE2d 886)

RUFFIN, Judge.

Betty Jean Faulkner, her four siblings, and her mother allege that defendant John Buffington orally agreed to act as their agent to bid at a public auction on land owned by defendant Joseph Fields. According to the plaintiffs, Buffington's daughter, defendant Beth Buffington Hood, purchased the property and wrongfully refused to convey it to them in accordance with the agreement. The trial court granted the defendants' motion for summary judgment on the ground that the plaintiffs' claims were barred by the statute of frauds. We affirm for a different reason — because the alleged agency agreement was too indefinite to be enforceable.

"Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[1] We review a grant of summary judgment de novo, considering the evidence, and all reasonable conclusions and inferences therefrom, in the light most favorable to the nonmovant.[2] We will, accordingly, affirm a grant of summary judgment if it is right for any rea-

---

[1] *Nairon v. Land*, 242 Ga. App. 259 (529 SE2d 390) (2000).
[2] Id.

son.[3]

So viewed, the record shows that Fields purchased approximately 63 acres of land from H. L. Butterworth in 1976. In exchange for the land, Fields executed a promissory note in favor of Butterworth, which was to be repaid in monthly installments over 32 years and which was secured by a deed to secure debt on the property. Butterworth died intestate in 1996, leaving a wife and five children — Faulkner, Mary McGonigle, Martha Jones, J. H. Butterworth, and W. L. Butterworth (collectively "the Butterworths").

At the time of H. L. Butterworth's death, Fields was delinquent in his payments on the promissory note. The surviving Butterworths wanted to obtain Fields' property because it adjoined "the old homeplace" where the children grew up and their mother still lived. They consulted attorney Samuel Oliver, who recommended that the estate foreclose on the land, which he said would involve a public auction. The Butterworths agreed, and Oliver sent notice to Fields of the pending foreclosure and advertised the public sale in the local newspaper. According to the Butterworths, Oliver told them not to bid on the property at the sale and not to approach Fields directly to negotiate a solution.[4]

Before the sale, W. L. Butterworth went to discuss the pending foreclosure with Buffington, who, together with his daughter Hood, owned a farm bordering the Fields property. W. L. testified that he told Buffington that the Butterworth family wanted the property back. A few days later, W. L. went to see Buffington again, along with his brother, J. H. According to W. L.,

> we talked to [Buffington] about just resuming whatever was owed on [the land], and we would take care with him or whatever it he — he said, well, he wasn't interested in it no how because there was not enough land. And that's when we told him we would like for him just to bid for us, and he said he would.

W. L. stated that he hoped Buffington would be able to buy the property by paying only what Fields owed on the note. However, he did not tell Buffington how much to bid and did not set any maximum price. W. L. also stated that Buffington never requested anything in return for bidding on behalf of the family. Finally, W. L. testified that

---

[3] *Sellers Bros., Inc. v. Imperial Flowers*, 232 Ga. App. 687, 689 (3) (503 SE2d 573) (1998).

[4] Oliver denied making any such statements and said that, to the contrary, he told the family that they should attend the sale and be prepared to bid at least the amount of debt owed by Fields.

Buffington said he might let his daughter, Hood, do the bidding for him.

J. H. testified that he was not present when his brother asked Buffington to bid on the land for them, but that he understood that Buffington would buy it with his own money and then convey it to the Butterworth family. McGonigle, Jones, and Faulkner testified to the same understanding, apparently based on what W. L. told them. All of the siblings agreed that there was no agreement on how much Buffington would be allowed to bid or on what, if anything, to pay him for his services. The alleged agreement between the Butterworths and Buffington was not in writing.[5]

Hood testified that she learned of the pending foreclosure through her father and decided to purchase the land herself. On the day scheduled for the sale, she went to Oliver's office, along with Fields, and wrote a check for approximately $44,000 to pay off Fields' outstanding debt. Accordingly, the public sale did not occur.[6] Later that day, W. L. and J. H. Butterworth met with Oliver, who told them that he had received a check for the amount owed on the property. The following week, at Oliver's request, W. L. and J. H. signed a document transferring and assigning to Hood the promissory note and deed to secure debt on the property. Although they did not read it, W. L. and J. H. claimed they understood the document to be "a method devised by Defendant Buffington" for acquiring the property so that it could be transferred back to the Butterworths. Fields then executed a warranty deed to the property to Hood, who transferred approximately four acres of the land back to Fields and granted him the right to cut timber on the whole parcel.

Believing that Buffington and/or Hood would transfer the land to them, the Butterworths contacted Buffington multiple times after the sale. Each time, Buffington allegedly told them that "as soon as he got it surveyed and everything, he would turn it back over to us" in exchange for repayment of the $44,000. Eventually, according to the complaint, Buffington told the Butterworths that "anyone has a right to change their mind."[7]

The Butterworths sued Buffington, Hood, and Fields for fraud

---

[5] Buffington denied that the Butterworths asked him to buy the Fields property and convey it back to them, and he stated that he "was not in a position to buy anything at that time." He also said that he did not know that the Butterworths wanted the property for themselves.

[6] Oliver testified that he understood that the estate was required to accept payment of the debt from Fields or someone acting on his behalf.

[7] Buffington testified that he merely agreed to tell Hood that the Butterworths wanted the opportunity to purchase the land. According to Buffington, Hood said that she did not have the deeds "straighten[ed]," but she did not say whether she would sell the land back to the Butterworths. Hood denied that Buffington or anyone else ever told her that the Butterworths wanted the land.

and breach of an alleged agency agreement. They alleged that "a contract existed between the Plaintiffs and Defendant Buffington to the effect that Defendant Buffington would take those steps necessary to acquire legal title to the subject property" and then transfer the deed to them, and they claimed that Hood acted as a subagent on behalf of Buffington. The defendants moved for summary judgment on the grounds that (1) the alleged agreement was required by the statute of frauds to be in writing, (2) the agreement was too vague and indefinite to be enforceable, and (3) the Butterworths suffered no damages. The trial court granted the motion on the first ground.

Pretermitting whether the alleged agreement was required to be in writing,[8] we conclude that it was too indefinite. To be enforceable, "an agreement must be expressed plainly and explicitly enough to show what the parties agreed upon, and an agreement expressed in incomplete or incomprehensive terms cannot be enforced."[9] Assuming, as we must for the purpose of summary judgment, that the testimony of the Butterworths is correct, "[i]t has not been shown, with any reasonable certainty, what the parties were obligating themselves to do."[10]

First, the parties never agreed upon how much Buffington would pay for the property. In fact, W. L. testified that he did not even discuss the matter with Buffington, except to say that he hoped Buffington would be able to buy the land for the amount of the outstanding debt. The Butterworths argued to the trial court that the absence of an agreement on price was not fatal because "no one was sure what amount of money would be necessary to acquire the property." While that is true, the Butterworths could have provided their alleged agent with a maximum bid price, or at least a general range of how much they were willing to pay. But there is no evidence that Buffington had any criteria whatsoever for determining how high to bid.

The situation might be different had the parties agreed that Buffington would do whatever was necessary to acquire the land and that the Butterworths would reimburse him no matter how much he had to pay. But the evidence shows that the Butterworths were not willing to purchase the land if, in their estimation, Buffington paid too much for it. When asked during his deposition whether the family would have repaid Buffington had he bid $100,000 to acquire the

---

[8] The general rule is that "the authority of an agent to execute a contract or memorandum for the sale of real estate . . . must be evidenced by writing." *Deal v. Dickson*, 232 Ga. 885, 886 (1) (209 SE2d 214) (1974); see also *Turnipseed v. Jaje*, 267 Ga. 320, 322 (477 SE2d 101) (1996). But the Butterworths argue, in essence, that this rule does not apply because the statute of frauds may not be used to perpetrate a fraud, which they claim was the case here. See *Chastain v. Smith*, 30 Ga. 96, 98 (2) (1860).

[9] *Patel v. Gingrey Assoc.*, 196 Ga. App. 203, 206 (2) (395 SE2d 595) (1990).

[10] *Lemming v. Morgan*, 228 Ga. App. 763, 765 (1) (492 SE2d 742) (1997).

land, W. L. responded that "we *probably* would have," but there was "no deal" on that point. (Emphasis supplied.) Thus, the Butterworths acknowledge that Buffington was not authorized to bid an unlimited amount, but they provide no evidence as to the scope of his alleged agency.

Second, there was no agreement between the Butterworths and Buffington regarding what, if anything, Buffington would receive in return for acting as their agent. W. L. testified that he never discussed this issue with Buffington. And even within the family, there was no consensus. McGonigle testified that she did not know whether Buffington was supposed to receive a fee; Jones stated that she understood that Buffington would not receive a fee; Faulkner said that they planned to give Buffington "a little money for doing this for us, but no amount was ever mentioned"; J. H. Butterworth testified that the family would pay Buffington "whatever he charged to do it for us"; and W. L. Butterworth stated that they "might have paid him if he had asked." Thus, the key element of what consideration, if any, Buffington was to receive remained undecided. "[I]t is axiomatic that for a contract to be enforceable, the material terms of that contract cannot be left to future negotiation."[11]

The Butterworths argued to the trial court that the lack of agreement on Buffington's compensation was unimportant because agents may act gratuitously. The parties could, of course, have elected to enter into an enforceable gratuitous agency relationship.[12] The record shows, however, that they reached no understanding one way or the other as to whether Buffington would be paid. While an agent for hire owes his principal a duty of "diligence, loyalty, and absolute good faith,"[13] a gratuitous agent is liable "only for gross neglect."[14] Thus, the question of whether Buffington was to be paid was not merely incidental; rather, it determined the extent of his obligations to the Butterworths. The absence of any agreement on this point shows that there was no meeting of the minds on another key element of the alleged contract.

We do not hold that, for an agency relationship to be valid, the principal must always provide detailed directions regarding all of the agent's transactions. Where such instructions are not explicitly stated, they often may be inferred from established custom or the parties' course of dealing.[15] But in this case, the Butterworths are

---

[11] *Southeastern Underwriters v. AFLAC, Inc.*, 210 Ga. App. 444, 446 (1) (436 SE2d 556) (1993).

[12] See *Carmichael v. Silvers*, 90 Ga. App. 804, 813 (1) (a) (84 SE2d 668) (1954) (payment of compensation not essential to creation of agency).

[13] *Anderson v. Redwal Music Co.*, 122 Ga. App. 247, 251 (176 SE2d 645) (1970).

[14] OCGA § 10-6-22.

[15] See *Central of Ga. R. Co. v. Felton*, 110 Ga. 597, 600 (1) (36 SE 93) (1900) (in absence of specific instructions, agent may follow general custom or course of dealing).

alleging that Buffington agreed to act as their special agent for a single, limited purpose — to bid on the Fields property at the foreclosure sale. They do not allege that Buffington represented them as a general agent or in an ongoing capacity.[16] Thus, there is no other evidence in the record from which a trier of fact might infer the scope of Buffington's authority and fill in the missing elements in the alleged agency contract.

As the contract was too indefinite to be enforceable, the trial court did not err in awarding summary judgment to the defendants.

*Judgment affirmed. Andrews, P. J., and Ellington, J., concur.*

ON MOTION FOR RECONSIDERATION.

On motion for reconsideration, the Butterworths argue that this Court failed to address their fraud claim and that the case should be remanded to the trial court for consideration of that claim. It is plain from the trial court's written order that the court granted summary judgment in favor of the defendants on *all* of the Butterworths' claims, including the tort claim. But on appeal, the Butterworths enumerated as error only the grant of summary judgment as to their contract claim, and their appellate brief addressed only the contract and agency issues. Our Supreme Court has instructed that "[t]he appellate court is precluded from reviewing the propriety of a lower court's ruling if the ruling is not contained in the enumeration of errors."[17] Having failed to raise the issue of their tort claim on appeal, the Butterworths are not entitled to have the trial court revisit it now. The motion for reconsideration is therefore denied.

*Motion for reconsideration denied.*

DECIDED SEPTEMBER 28, 2000 —
RECONSIDERATION DENIED NOVEMBER 8, 2000.

*James N. Butterworth*, for appellants.
*Stewart, Melvin & Frost, J. Douglas Stewart*, for appellees.

---

[16] See generally *Interstate Financial Corp. v. Appel*, 134 Ga. App. 407, 412 (1) (215 SE2d 19) (1975) (discussing difference between general agent and special agent).

[17] *Felix v. State*, 271 Ga. 534, 539 (523 SE2d 1) (1999).